**Bolton v. Firearms Unlimited, Inc.**

Before Rahauser and Doyle, JJ.

*George E. Fowkes,* for plaintiff.
*David Rainero,* for defendant.

DOYLE, J., July 26, 1973.—The matter is before the court en banc on plaintiff's exceptions to the court's nonjury findings.

By written agreement dated August 1, 1968, defendant retained plaintiff's services as a salesman for a base salary of $200 per week, increased to $225 on March 21, 1969 (base pay) and a bonus, detailed infra. By its terms, the contract terminated on December 31, 1970, unless mutually extended. Defendant provided plaintiff with a motor vehicle, an expense account, hospitalization and medical insurance, a two-week paid vacation (three weeks after the third year and four weeks after the fifth year), and permitted him to retain, sans accountability, fees for services he rendered in cashiering "shoots," instructing target shooters and conducting courses for gun club management and operation.

Plaintiff is prohibited, section 9 of agreement, from using or permitting others to use customer lists and confidential information, and agrees not to engage in any similar business for a period of five years from termination of his employment in any territory that [defendant] is doing business in at the time of [plaintiff's] termination. Defendant reserved the

right, section 10, to terminate plaintiff's employment "at any time for any reason sufficient to [defendant]" and "Upon such termination [plaintiff] shall receive six months' base pay and his pro rata share of the four percent net profits when the net profits shall be determined at the end of the fiscal year." (bonus).

On October 13, 1969, defendant terminated plaintiff's employment effective, *eo die,* and delivered to him its check in the sum of $450 (gross salary for two weeks) drawn to his order, bearing the notation: "Acceptance[1] of this check constitutes payment in full for any and all claims for severance pay." Plaintiff did not deposit the check for collection or present it for payment. Plaintiff also claims the sum of $2,007.99 for expenses he allegedly incurred while employed by defendant.

Defendant's counterclaim alleges that during the course of his employment, plaintiff competed directly with defendant, solicited business for defendant's competitors and, after being terminated, continued to compete actively with defendant and is presently competing with defendant although requested to refrain from competition. As a result of those activities, defendant alleges loss of business, customers and profits. Defendant also counterclaims for the sum of $3,147.31 based upon plaintiff's oral guaranty of credit sales of merchandise of that value to Yorktown Custom Arms Company.

Defendant's president Bennett testified that the contract between the parties was drawn by plaintiff; the check was delivered to plaintiff in payment of wages due under the contract and not for any moneys provided for in section 10 of the contract; plaintiff was terminated because defendant learned from "the industry" that plaintiff was moving into a competing

[1] Not meant in the sense of receipt of delivery by the payee or certification by the drawee.

business; the president wanted to determine whether plaintiff was violating the noncompetition covenant of the contract before delivering additional moneys to plaintiff; he had no complaint regarding plaintiff's submitted expense accounts; all expense accounts which were submitted were paid; during and after his employment, plaintiff, via newspaper advertisements and otherwise, solicited persons to do business with defendant's competitors.

A board of arbitrators awarded plaintiff the sum of $5,739.62; the dissenting arbitrator would award only 539.62. Plaintiff's appeal from that award, heard pursuant to a nonjury stipulation, resulted in a finding: "for Plaintiff in the sum of $2,093.23 and for Plaintiff as to the Counterclaim; the demand for an accounting [being] refused." Plaintiff filed an exception: "To the Court's failure to award the Plaintiff termination pay in the amount of $5,200.00 and a bonus in the amount of $400.00."

## EXPENSE MONEYS

The expense moneys in issue were not claimed by plaintiff while he was employed by defendant, being demanded only after suit was instituted. Defendant's office manager and bookkeeper testified from records showing that plaintiff had submitted expense accounts commencing on October 31, 1968, and terminating on October 13, 1969, the date of plaintiff's discharge, and that all submitted expense accounts were paid to plaintiff.

Plaintiff's excuse for not submitting at an earlier date the now claimed expense accounts was that he believed that defendant was financially distraught and he withheld his expense vouchers in order to aid defendant. However, during the same period of time, plaintiff did submit other expense accounts which were paid.

Although the contract is silent as to when expense accounts are to be submitted, the submission of partial accounts may imply a waiver of the amounts not submitted. The excuse, supra, for nonsubmission during the time of his employment appears to be a feigned solicitude for defendant, a post litem afterthought or a beau geste. Or, defendant's president Bennett may have correctly assessed the situation, viz., while employed by defendant, plaintiff, in fact, solicited orders for defendant's competitors and the now claimed expenses were incurred for those purposes and not for work performed on behalf of defendant, thus inducing plaintiff's reticence. The inference is buttressed by the *fact* that during December, within two months after his termination by defendant, plaintiff formally became an incorporator, a director, the highest executive officer and a 25 percent owner in a directly competing Pittsburgh based business (Skeetrap, Inc.)[2] and through advertisements, etc., Skeetrap and plaintiff solicited customers of defendant. It seems clear that plaintiff has either waived his right to receive expense moneys by failing to submit payment vouchers during the time when he was employed or that the claimed expenses were incurred for promoting plaintiff's own interest.

## BASE PAY AND BONUS

Plaintiff insists that eo instanti discharge his right to the base pay and the bonus vested and defendant's failure to pay these moneys annulled his covenant not to compete; alternatively, that his covenant not to compete is conditioned upon his receiving the "termination pay" (plaintiff's label) and the bonus.

[2] Articles verified by plaintiff on December 24, 1969, and approved on December 29, 1969, named Pruett Schaffer Chemical Co. as the other incorporator and E. R. Coyle and Joseph K. Hathaway as the other directors.

Further, that defendant's failure to pay him constituted a material breach of the contract sufficiently serious to abrogate his covenant not to compete.

Plaintiff demands performance by defendant although asserting that he is under no duty to perform. However, the "termination pay" is either deferred compensation for work performed while plaintiff was employed or it is consideration for *performance* of the noncompetition covenant.[3]

Defendant cites Krauss v. M. L. Claster & Sons, Inc., 434 Pa. 403 (1969). Krauss, an employe and shareholder of Claster, voluntarily terminated his employment with Claster and in exchange for Claster's covenant to purchase said shares contracted not to compete with Claster. The share certificates were delivered to Claster, but when Krauss commenced competition Claster ceased delivery of payments for the shares. Krauss sued to recover the unpaid purchase price and defendant raised plaintiff's breach of his noncompetition covenant as a defense. Judgment for defendant was affirmed on appeal. Plaintiff Bolton claims Krauss is inapposite because, he asserts, defendant is in default.

Although the contract is silent on the point, it appears that the most reasonable interpretation of the language is that defendant's covenant to pay the base pay was the bargained-for exchange for plaintiff's performance of his covenant not to compete. It would strain all reason to hold that defendant remained contractually bound to pay moneys in exchange for an ineffective noncompetition covenant.[4] Under plaintiff's theory, if defendant had been discharged at any

---

[3] In this *assumpsit* action we are precluded by Krauss, supra, from determining whether five years is a reasonable time for a noncompetition covenant.

[4] See Restatement, Contracts, §236.

time, e.g., as early as one week after commencement of employment, defendant would have owed plaintiff the sum of $5,200 under the original agreement. Such an interpretation would perpetrate a legal outrage. See Restatement, Contracts §275, Comment a.

If the payment is treated as compensation for noncompetition, then that compensation is owed only while plaintiff is not competing. But competition admittedly commenced on January 1, 1970, and may have commenced prior to plaintiff's termination of employment. With the benefit of every favorable inference, plaintiff refrained from competing with defendant for a period of only 79 days or 11-2/7 weeks, only 71 days prior to formal incorporation of Skeetrap. If plaintiff were to receive $5,850 for not competing for five years, 260 weeks, he would be entitled to $22.50 per week during the time which he did not compete or a total sum of $253.90.

If, however, we reject plaintiff's testimony and credit defendant's evidence and conclude that prior to his termination plaintiff had already begun to compete with defendant[5] and defendant treated this as cause for discharge, even though not required to cite any cause, and we further treat the agreement for base pay as being made in consideration of noncompetition, then plaintiff is entitled to nothing for his claim for base pay.

The contract, section 10, does not label the payment as "severance" pay. The parties could have so labelled it; an exchange for defendant's right to terminate without notice or cause. Cf. Philadelphia Ball Club v. Lajoie, 202 Pa. 210, 219 (1902). Defendant's promise

---

[5] This may constitute an anticipatory breach or repudiation of the covenant not to compete. See Restatement, Contracts, §318.

to pay and plaintiff's promise not to compete constitutes a bilateral contract, the performance of each covenant being a condition precedent to the right to enforce the complementary covenant. We find the intent of the parties to be that defendant's duty to pay the base pay was an exchange for performance of plaintiff's covenant not to compete. The contract must be construed against plaintiff, since he prepared it: West Penn Realty Co. v. Acme Markets, Inc., 224 Pa. Superior Ct. 202 (1973).

That part of defendant's counterclaim which is based upon the oral guaranty agreement must be denied. The applicable statute of frauds provides: *"No action shall be brought . . .* to charge the Defendant, upon any *special* promise, to answer for the debt or default of another, *unless the agreement* upon which such action shall be brought . . . *shall be in writing, and signed by the party to be charged* therewith": Act of April 26, 1855, P. L. 308, sec. 1, 33 PS §3.

Plaintiff's claim for an accounting was withdrawn after the parties stipulated the bonus as being $400, which amount will be awarded to plaintiff as deferred compensation, included in the contract for the purpose of inducing plaintiff to work vigorously and thus share in the results of his own efforts. No evidence was proffered on any other claim or counterclaim.

An appropriate order will be entered.

### ORDER

And now, July 26, 1973, plaintiff's exception to the findings is dismissed, the award of the arbitrators is vacated, and the prothonotary is ordered to enter judgment in favor of plaintiff and against defendant in the sum of $400.